HAROLD E. CARTER et al. *vs.* REARDON-SMITH LINE, LTD., et al.

*Foreign Corporation—Service of Process—Issue as to Agency— Evidence—Doing Business in State.*

That, on a motion to quash a writ of summons served on one as the local agent of a foreign steamship company, the court admitted a contract with the latter's general American agent by which such asserted local agent was appointed as such, and also a letter from such general agent cancelling the appointment, did not involve reversible error, the signatures to such contract and letter being later regularly proved.     p. 551

That a witness was allowed to state the legal effect of documents involving the appointment of a certain company as an-

other's agent, *held* harmless, in view of the presence in the case of sufficient evidence to warrant the conclusion that such company had authority for the purpose of the issue involved, the appointment by it of a sub-agent.                    p. 551

Evidence that one was appointed local agent for an English steamship company by a certain American company, that the resident American director of the English company recognized him as local agent, that he acted as such agent for about a year, that the president of the English company, on a visit to that locality, express satisfaction with the status of affairs, and that the American company advertised itself as general agent of the English company, and accumulated cargoes for it at various ports, *held* to warrant the inference that the American company was authorized to appoint such local agent, and to cancel the appointment.                    pp. 551, 552

On a motion to quash a summons in an action against a foreign steamship company, on the ground that the alleged agent on whom it was served was no longer agent, evidence that the business of the company in that locality was unprofitable was admissible, as showing the good faith of the company in terminating the agency.                    p. 552

On an issue as to whether an American corporation was the general agent of an English steamship company, advertisements of the sailings of ships of the company, which appeared in New York papers, and in which the American company was named as "general agents" of the English company, were admissible as tending to prove that the English company permitted the American company to hold itself out as its agent, the resident director for this country of the English company himself living in New York.                    p. 552

An objection to the form of a question to a witness cannot be considered for the first time on appeal.                    p. 553

On an issue as to whether the agency of one on whom a summons against a foreign corporation was served had ceased at the time of such service, the motives of such person in continuing to represent himself as such agent in the city and telephone directories, and in his door and window signs, were irrelevant, for the purpose of affecting the rights of third persons to whom such motives had never been communicated.                    p. 553

In an action against a foreign steamship company on account of a shortage in a shipment, on a motion to quash the summons as having been served on one not defendant's agent, evidence as to the circumstances of the shipment and the financing of the purchase involved was neither relevant nor material.                                    p. 553

One whose local agency for a foreign steamship corporation as regards "general cargo" business had been terminated, was not a resident agent for the service of process against the corporation, within Code, art. 23, sec. 118, although he continued from time to time to act for the corporation when "tramp" steamers operated by the company touched at that port, he being employed separately for each of such steamers, and although he continued to appear as the company's agent in the city and telephone directories, kept its name on his office door and corresponded with the company in regard to the plaintiff's claim.                                    pp. 556, 557

A steamship company which had discontinued its "general cargo" service to Baltimore, was not, merely because its "tramp" steamers still occasionally entered that port, "regularly doing business" or "regularly exercising any of its franchises" within the state, so as to render applicable Code, art. 23, sec. 118, in regard to suits against foreign corporations.        pp. 558, 559

The provision of Code, art. 23, sec. 118, that if a foreign corporation, after incurring liability in this state, or after making a contract with a resident thereof, ceases to do business in the state or to have a resident agent or officer therein, suit may be brought in the county or city in which the plaintiff resides, and process may be served on one who was last a resident agent or officer, does not apply to a suit by a non-resident of the state.
                                    p. 559


*Decided June 11th, 1925.*


Appeal from the Superior Court of Baltimore City (SOL-TER, J.).


Action by Harold E. Carter, Herwald Ramsbotham and Victor C. Ponsonby, co-partners, trading as "Carters" of

London, and William George Blakemore, liquidator of Car-
lin, Phipps & Company, Ltd., against the Reardon-Smith
Line, Ltd., and others. From an order sustaining a motion
by the named defendant to quash the writ of summons as to
it, plaintiffs appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, AD-
KINS, OFFUTT, PARKE, and WALSH, JJ.

*John B. Deming,* with whom were *Keech, Deming & Car-
man* on the brief, for the appellants.

*Robert W. Williams* and *James Carey, 3rd,* with whom
were *Janney, Ober, Slingluff & Williams* on the brief, for
the appellees.

OFFUTT, J., delivered the opinion of the Court.

The Reardon-Smith Line, Ltd., a corporation under the
laws of Great Britain, has for a number of years been en-
gaged in the business of transporting freight for hire on
ocean going vessels from ports on the Atlantic seaboard of
the United States to ports in other countries. Its freight
service appears to have been divided into two classes, one a
"berth" or "general cargo" business, and the other a "tramp"
or "full cargo service." In the general cargo business, a
certain regularity and uniformity as to the time and place
of service is maintained, while in the "full cargo" or "tramp"
service there is no such uniformity or regularity, but the
vessels are chartered under a single charter party, and
whether they arrive at or depart from a given port depends
upon no regular schedule or sailing list, but upon the needs
and convenience of the charterer. In connection with its
business as an ocean carrier, the Reardon-Smith Line,
Ltd., hereinafter referred to as the Reardon-Smith Line,
owned and operated a number of freight carrying ships,
some of which were allocated to the general cargo business
and others to the full cargo or "tramp" service. In the
course of its general cargo business, it attempted to estab-

lish freight carrying lines between different ports in the
United States and ports in Great Britain and Germany, car-
rying accumulated cargoes and operating on a definite sched-
ule, and in connection with that general purpose, on or about
December, 1922, it established an ocean carrying freight
line between Baltimore and London, Liverpool, and Ham-
burg. It was, as we have said, a British corporation, and
it transacted its business in this country by agents, who ap-
pear to have been W. G. Liley of New York, its resident
director and American representative, and the United States
Navigation Company.

When the line from Baltimore was established, the United
States Navigation Company, hereinafter called the Naviga-
tion Company, claiming to be the general agent of the Rear-
don-Smith Line for its general cargo or berth service in this
country, entered into a contract with Maurice B. Carlin, a
ship broker of Baltimore, whereby Carlin was appointed the
agent of the Reardon-Smith Line for its Baltimore general
cargo service from December 11th, 1922, to January 1st,
1924, and at the same time he was selected by Mr. Liley as
the agent for such of the company's "full cargo" steamers
as came to Baltimore.

The "general cargo" or berth service from Baltimore was
discontinued in 1923, and Carlin's employment as the com-
pany's agent at Baltimore for matters connected with that
service was, the company contends, cancelled as of December
31st, 1923.

On or about March 22nd, 1923, while the relation of prin-
cipal and agent still existed between Carlin and the com-
pany, Edward M. Langley & Company, Cincinnati, Ohio,
shipped one hundred and fifty barrels of rye whiskey on a
"uniform through bill of lading over the lines of the Rear-
don-Smith Line, and the Baltimore & Ohio Railroad Com-
pany from Lynchburg, Ohio, to Cecil William Plumb at
London. Several co-partners, trading as "Carters," bankers
of London, financed the purchase, and as security took an
assignment of the bill of lading. The shipment was deliv-

ered to the City of Quebec, one of the Reardon-Smith Line's vessels, by the Canton Railroad Company, a connecting carrier, and ultimately delivered in London, where it was found to be thirty-five barrels short. "Carters" thereupon demanded that the carriers make good that shortage, and upon their refusal this suit was instituted against the two railroad companies and the Reardon-Smith Line.

The action was begun on January 24th, 1924, and on March 20th, 1924, the Reardon-Smith Line was summoned by service on Maurice B. Carlin, as its agent. The Reardon-Smith Line moved to quash the writ of summons on the ground that when it was served Carlin was no longer its agent, and the court, after hearing testimony upon that question, sustained the motion and quashed the writ, and from that order this appeal was taken.

The record contains eight exceptions, of which seven relate to rulings on questions of evidence and one to the order quashing the writ of summons.

The first exception deals with the action of the court in admitting in evidence the contract between Carlin and the United States Navigation Company, under which Carlin was employed as the appellee's agent, and the second to its action in allowing the appellee to offer in evidence a letter dated November 26th, 1923, cancelling that employment as of December 31st, 1923. John W. Praesent, secretary of the United States Navigation Company, was asked what were the relations between that company and the Reardon-Smith Line and he answered that it was the general agent of that company to represent general cargo boats, and the appellants objected to that question and answer. The court then asked "How were you appointed?" and the witness replied, "By correspondence; and our vice-president went over to Cardiff, Wales, and made the connection." Objection was also made to this question and answer, which was overruled, and the witness answered: "We only represented the Reardon-Smith steamers accumulating cargoes for certain ports like Hamburg and Liverpool where we had regular service according

to our schedule, not on full cargoes." The appellants then
excepted to the "ruling of the court in permitting the wit-
ness to answer said question," and that is the third excep-
tion.

If the United States Navigation Company was the gen-
eral agent of the Reardon-Smith Line, then in view of all
the testimony in the case there was no reversible error in ad-
mitting the contract of agency and the cancellation thereof,
because later in the case the signatures of the officers of the
Navigation Company to that contract and the letter of can-
cellation were regularly proved, and the whole question
turns therefore on whether the evidence did show that the
Navigation Company was authorized to employ Carlin as
the agent of the Reardon-Smith Line. The witness, in giv-
ing the testimony involved in the third exception was ob-
viously not attempting to construe the correspondence to
which he referred, but was describing a status which re-
sulted from the course of business between the Reardon-
Smith Line and the Navigation Company, and while the
witness should not have been permitted to state the legal
effect of documents not proved in the case, his statement
could not have injured the appellants, in view of the fact
that there was in the case evidence sufficient to have war-
ranted the court in concluding that the Navigation Company
was authorized on behalf of the Reardon-Smith Line to em-
ploy Carlin as the latter's agent. It is uncontradicted that
before that contract Carlin met W. G. Liley, resident direc-
tor in the United States of the Reardon-Smith Line, and its
American representative, at his office in New York at the
request of Mr. Oelsner, president of the Navigation Com-
pany, and at that interview, at which Mr. Oelsner was pres-
ent, he, Liley, approved the arrangement of establishing a
line in Baltimore, and that thenceforth Liley considered Car-
lin & Company as his Baltimore agents; that after the con-
tract Sir William Reardon Smith, chairman of the board of
directors of Sir William Reardon Smith & Sons, and Liley,
visited Carlin in Baltimore and told him that he, Smith, was

"quite pleased" with the way things were going; that the Navigation Company advertised itself in the trade journals as the general agents of the Reardon-Smith Lines; that it represented that company in accumulating cargo at certain ports where that company operated a regular schedule; and that for about a year Carlin acted as agent in Baltimore for the Reardon-Smith Company's "berth" or "full cargo" business, and that the only authority he had to act as such agent was derived from the contract with the Navigation Company. This evidence was, we think, sufficient to warrant the inference that the Navigation Company was authorized to employ Carlin and to make a contract of agency with him, and also to cancel it, and we find therefore no reversible error in the rulings involved in the first three exceptions.

The fourth exception relates to the action of the court in permitting the appellee to prove that the Baltimore venture turned out unprofitably. That evidence reflected upon the good faith of the appellee in terminating the agency, and was in our opinion properly admitted.

The court, over appellants' objection, permitted the appellee to offer in evidence clippings of advertisements of sailings of the appellee's ships engaged in the general cargo business from issues of the New York Commercial and the Journal of Commerce of August 9th and August 11th, 1923, and a sailing list, in all of which the Navigation Company described itself as the "General Agents" of the Reardon-Smith Line, and those rulings are the subject of the fifth exception. This evidence tended to prove that the appellee permitted the Navigation Company to hold itself out as its agent. For while it does not appear directly that it saw the advertisements or the sailing list, it may reasonably be inferred that it did, when the nature of its business, and the fact that its American representative was directing the business of the company in the very city where these papers were circulated among persons interested in that trade, are considered, and we find no error in this ruling.

In the course of the examination of Carlin, he was asked

this question: "In connection with the city directory and the telephone book and the window sign and the door sign, would it not be proper to say that the cause for their existence beyond the cancellation of that contract of December 11th was either inadvertence on your part or unwillingness to go to the expense of making the correction, but that you did not understand that you had any authority?" To which the appellants objected. The objection was overruled and that ruling is the subject of the sixth exception. The form of the question is undoubtedly bad, but as no objection appears to have been made to it on that ground in the trial court, we cannot consider that objection here. But it was also objectionable because it had no possible relevancy to any issue in the case, since Carlin's motives, whatever they may have been, could hardly have affected the rights of third persons to whom they had never been communicated, but in the view we take of this case the appellant was not injured by the error.

At the close of the appellee's testimony the appellants offered to prove by competent evidence the circumstances under which the whiskey was bought and shipped, and the purchase financed, but the offer was overruled, and that ruling is the subject of the seventh exception. We find no error in that ruling. The only issue before the court was whether the appellee was bound by service of the writ of summons on Carlin as its agent, and the evidence referred to in this exception was neither relevant nor material to that issue.

The eighth exception relates to the court's action in quashing the writ of summons and presents a mixed question of law and fact. That ruling necessarily assumed that the evidence adduced in support of the motion was sufficient to establish the fact that when the writ was served Carlin was not the agent or the servant of the appellee within the meaning of the statutes relating to the service of process upon foreign corporations, and a consideration of it requires us to refer in some detail to the evidence bearing upon that issue.

Maurice B. Carlin testified that the agency contract between him and the Navigation Company was executed on December the 11th, 1922; that on November 26th, 1923, he received a letter from that company cancelling the contract, the cancellation to take effect December 31st, 1923, and offering to renew the contract on the same terms except that the new contract would be between Carlin and the Navigation Company as principal; that he wrote that company on November 28th expressing his willingness to renew the contract with it as principal, but that in fact it never was renewed, and that after it was cancelled he had no further relations with the appellee; that the last ship of the Reardon-Smith Company which was subject to the agency contract with the Navigation Company was the Bradburn, which left the port of Baltimore on August 8th, 1923, and that "we have not acted since the Bradburn; we have had absolutely no relations with them at all"; that in addition to representing the appellee in its general cargo business he "handled several steamers apart from that agency under employment by W. G. Liley, resident director of the Reardon-Smith Lines in the United States. He was resident director or the American representative of Sir William Reardon Smith & Sons. These steamers in every instance were under full cargo charter"; that between July 1st, 1922, and May 5th, 1923, he handled six Reardon-Smith full cargo ships, none of which came under his contract with the Navigation Company; that his stationery, and the lettering on his office door, and the entries in the telephone and general city directories, carried his name as agent for the appellee after the termination of the agency; that prior to the termination of the agency he informed counsel for the appellants that he was the agent for the appellee and that process against it could be properly served on him (which was true at that time); that from time to time during his agency he corresponded with the Navigation Company concerning the appellants' claim; and that on January 24th he wrote to that company inclosing a letter in reference thereto from the appellants' attorneys, and noti-

fying it that the sheriff had attempted to summon him as the agent of the appellee, and he also testified: "The general nature of the defendant's business is that of ocean carriage. They had what is known as berth service, a regular line in operation from the various Atlantic ports, arranged with regular sailing schedule, which are advertised. Apart from this berth service or regular line service, there were probably thirty steamers that kept moving around all parts of the world ready for charter parties wherever they may be chartered, generally referred to as tramp steamers." And in conclusion he gave this testimony: "Q. Is it not common practice in the case of tramp steamers to appoint the agent at the time the ship calls at the receiving port? A. No, it certainly is not; if an owner had been doing business with a man at any one particular port, naturally he is going to send all his ships to him, and if he has not had any before, he is going to look around and get himself an agent. Q. He would be likely to have the same man? A. Certainly, unless that man displeased him in some way or other. Q. He would not enter into any continuing contract, but he would take it up every time a ship came in? A. Yes; he would. Q. As a matter of fact that is the kind of full cargo relations you had with the Reardon-Smith Line, Ltd., in the boats you handled? A. Each ship was a separate transaction; yes, sir." The testimony of the other witnesses in the case add nothing material to these facts and need not be referred to in detail.

It appears from this testimony that during the year 1923 Carlin acted as the agent of the appellee in respect to its "berth" or "general cargo" service under a continuing contract of agency, that after 1923 that employment was terminated, and he was no longer the appellee's agent in respect to that service, and that the service itself was discontinued. It also appears that prior to and during 1923 he acted as the appellee's agent in isolated instances in respect to several of its "full cargo" or "tramp" steamers, but that he was employed separately as to each of those vessels. It further ap-

pears, from the declaration, that the bill of lading which is
the basis of the suit was executed, dated, and delivered at
Cincinnati, Ohio, and it nowhere appears that any liability
in respect to its non-performance was incurred in Maryland,
and finally it appears that the plaintiffs and the appellee are
non-residents of Maryland, having no office or any "resident
agent" within the meaning of article 23, section 118, Bagby's
Code of 1924, nor any officer in this State.

The question presented by the eighth exception is whether
upon those facts Carlin can be regarded as the appellee's
agent in Maryland for the service of process. That he can-
not be regarded as such an agent at common law is in our
opinion clear, and if such agency exists at all it can exist
only by force and virtue of the statute relating to the service
of process upon foreign corporations, for the testimony that
Carlin's agency in respect to the appellee's "general cargo"
or "berth" business in Baltimore was terminated prior to the
service of the writ of summons in this case is clear and un-
contradicted. Nor do we think that a continuance of the
agency can be inferred from the fact that, after it was re-
voked, Carlin's name was posted in the directories as the
appellee's agent, that he still kept its name on his office door,
or that he corresponded with his former principal in refer-
ence to appellants' claims. The appellee had done all that
it could to revoke his agency, there is nothing to indicate
that it in any way assented to or even knew of his use of its
name after the revocation, and the fact that he informed his
former principal of claims and demands made upon him in
connection with a transaction in which he had during the
agency acted for the appellee certainly did not revive the
cancelled contract. Nor can it be said that because Carlin
acted as the appellee's agent in isolated and distinct instances
in dealing with some of its "full cargo" or "tramp" steamers,.
that he became its agent for all such vessels which touched
at the port of Baltimore. If one employs an attorney, a
broker, a factor, or an agent to represent him in a particu-
lar matter, it cannot be said that by reason of that fact alone

he employs him generally to represent him in all matters. It frequently happens that persons will deal with a particular merchant or consult some one lawyer or physician, or transact their business and commercial affairs through a single factor or broker exclusively, but no presumption necessarily arises from that conduct that they are obliged to continue it, or that the persons employed by them represent them or are their agents except as to the particular matter in which they are employed. In this case the uncontradicted evidence is that Carlin was employed separately whenever he represented the appellee in dealing with one of its full cargo steamers, and we do not think that, in view of that evidence, there was any general or continuing agency in respect to such ships.

The final inquiry therefore is whether he was the appellee's agent within the meaning of the statute referred to above. That statute in part provides: "Any person or corporation, whether a resident or a non-resident of this State, may sue any foreign corporation regularly doing business or regularly exercising any of its franchises herein for any cause of action. Such suit may be brought in any county or in the city of Baltimore, as the case may be, where its principal office in this State, named in the certificate provided for by the next succeeding section of this article, is located or where it regularly transacts business or exercises its franchises * * *. If the corporation has no resident agent so authorized and prepared, process may be served (subject to the special provision for insurance companies and fraternal beneficiary societies, orders or associations hereinafter mentioned) upon any president, manager, director, ticket agent or officer of the corporation, or upon any agent or other person in its service. * * * If any foreign corporation shall, after incurring liability in this State or after making any contract with a resident thereof, cease to do business or to have such resident agent or a president, director, manager, or other officer herein, then and in such case suit may be brought in the county or city in which the plaintiff resides

and process may be served upon any person in this State who was last a resident agent, president, director, manager, or other officer of such corporation in this State."

That statute is not applicable to this case unless the appellee was "regularly doing business" or "regularly exercising any of its franchises" within this State at the time of suit except as stated below.

The first question therefore is whether the appellee was at the time of this suit "regularly doing business" or regularly exercising any of its corporate franchises" within this State. It is not denied that during the continuance of its "general cargo" or "berth" service in 1923 in Baltimore it was "regularly" doing business within the state, but it is contended that after the cessation of that service in August, 1923, it neither did business nor exercised its corporate franchises "regularly" therein, and whether it did or not depends upon the legal significance to be attached to the occasional use of the port by its "tramp" steamers.

The word "regularly" ordinarily implies uniformity, continuity, consistency, and method, and excludes the idea of an occasional, accidental, incidental or casual use, and it must have been intended that it should have that meaning in the statute, because its obvious purpose is to qualify, narrow and limit the meaning of the phrase "doing business," and it could not have that effect unless it were given its ordinary and accustomed meaning. Thus construed, the irregular, occasional, or accidental use of the port of Baltimore by "tramp" steamers would not constitute "regularly doing business" or "regularly exercising" corporate franchises within the state. In 1922 five "tramp" steamers owned by the appellee arrived and departed from Baltimore at intervals of from two days to several months; in 1923 three arrived and departed, and in 1924 two arrived and departed. These "tramps" operated on no regular schedule, but sailed hither and thither over all seas and to all ports as the needs of the business of those who chartered them required, and whether they called at Baltimore or Hamburg or London or

elsewhere was wholly uncertain and depended wholly upon the terms of each patricular charter party. The owner of these ships could no more be said to be "regularly doing" business in any one of these ports because these "tramps" called there, than would the owner of a garage be said to be doing business in a distant town or city because one who hired an automobile of him drove it there. The case of *Central of Georgia R. Co. v. Eichberg,* 107 Md. 363, cited by the appellants in support of the proposition that such a use constitutes "regularly doing business," is hardly in point, for the decision in that case is expressly based upon the finding that: "All these facts and circumstances taken together show that the sale of tickets and the issuance of through bills of lading by the domestic corporation over its own line and over the lines of the appellant, were not occasional or accidental, merely, but a part of its regular, usual and ordinary business; and that the domestic corporation was the recognized agent of the appellant, and as such, authorized to make contracts in this State, for the transporation of passengers and freight over appellant's lines in the State of Georgia."

In our opinion, therefore, at the time this suit was brought, the appellee was not "regularly doing business" or "regularly exercising" its corporate franchises within this state.

But assuming that the appellee did not regularly do business in this State when this suit was brought, nevertheless, the appellants contend, since it had done business therein under the provision of the statute referred to above, it may still be sued here with respect to any liability incurred in the state or any contract made with any resident thereof. But the provision of the statute upon which that contention rests only authorizes the suit contemplated by it to be brought "in the county or city in which the plaintiff resides," and is not applicable to such a case as this, where the plaintiff does not reside in the state at all.

It follows from what has been said that in our opinion the appellee was not regularly doing business or regularly exercising its franchises in the State of Maryland when this suit

was brought, and that Carlin was not at that time its agent, either at common law or under the statute. The order appealed from will therefore be affirmed.

*Order affirmed, with costs.*