ECKHART, ET AL. *v.* AYRES, ET AL.

[No. 410, September Term, 1964.]

154

*Decided October 12, 1965.*

*Paul W. Barnett* and *Lee C. Barnett* for appellants.

*William H. Geppert,* with whom were *Gunter & Geppert* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

We are urged to overturn a judgment of the Circuit Court for Allegany County entered upon a jury's verdict for the Defendants (Appellees). Appellants (Plaintiffs) sued in trespass q.c.f., claiming damages to a 350 acre tract felicitously called Flowery Meads, beneath which ran a vein of coal known as the Bakertown Seam.

Prior to 5 November 1934 William C. McClelland and Virginia S. McClelland, his wife, were vested with the legal title. It is conceded, however, that the land was owned by Lloyd B. Shaw, Mrs. McClelland's father, and that the McClellands were merely "figureheads." Shaw had the McClellands, for a consideration of $3,200.00, execute a deed which conveyed to Arthur

P. Hoffa (a Defendant) the coal in the Bakertown Seam lying under a 7.4 acre tract which was part of Flowery Meads.

There was also an agreement between W. C. McClelland and Hoffa, witnessed by L. B. Shaw, dated 7 November 1934, which gave Hoffa the right to mine and run a 10 ft. wide heading through the coal seam under Flowery Meads. Hoffa owned some coal which lay beneath land on the other side of Flowery Meads and he needed a right-of-way to get to it. The 7.4 acre tract was to the right of and near the 10 ft. right-of-way as it was finally established. It was agreed that Hoffa could keep the coal mined in running the right-of-way but that otherwise it was to be used only to haul out the coal owned by him. Shaw reserved a use in common for the mining of any of his own coal adjacent to the right-of-way.

Hoffa promptly arranged with Everett "Slewfoot" Miller to drive the 10 ft. heading. When Miller reached the 7.4 acre tract he saw that the coal was gone. After Hoffa verified this he went immediately to Shaw and demanded other coal to make up for what was missing. Although Shaw professed complete ignorance, he was willing to "make good." He said his father probably had sold it to someone else. He then said to Hoffa, "I want to make good. I want to be right. * * * Now we own coal on the northeast (left) side of the heading. When you come to this, why not take out enough coal to cover this?" Hoffa agreed.

Miller drove on through to Hoffa's other land and continued to take coal out until about 1940, when the operation was taken over by George Ayres. John Ayres (a Defendant) took over from George, his father, in 1953 and continued until 1958, when the mine was closed.

It was not until 1953 that any of the substitute coal Shaw gave Hoffa in 1934 was taken. By that time Hoffa's other seams had been worked out and Ayres was withdrawing toward the mine entrance. By 1958, because of excessive water, no more of the coal on the left could be reached from the right-of-way. Hoffa then directed Ayres to open a new shaft about 300 feet west of the one he had just closed so that the balance of the coal Shaw had given him in 1934 could be taken out.

In 1942 the McClellands conveyed to Shaw the reversion in the 7.4 acres and four years later they conveyed to him the

reversion in the entire tract. In 1952 Shaw created a tenancy by the entireties with his wife, Mary L. Shaw. He died in June of 1955 and she followed him in December, leaving the property to her children, Virginia S. McClelland and Andrew B. Shaw. On 14 June 1958 they sold it to the Appellants, Harry, Charles and Jonathan Eckhart. The Eckharts (Plaintiffs) are not related to either the Shaws or the McClellands.

Late in the spring of 1958, when John Ayres started to open the new shaft, he was aproached by Harry Eckhart, who described the encounter in these words: "Well, when we were looking over the property Mr. Ayres was starting a mine in about 300 feet below the old opening that he had been working in and I said to him, I said, you know you are starting in Shaw's coal and he said he didn't know. And he said Mr. Hoffa had told him to go in there and if anybody said anything to him to see him. So I said we just want you to know we are figuring on buying this property and it's all right to start the mine in here just so you know whose coal you are working and whenever you are ready to produce coal we will give you a lease. So later on we went back again and he was getting set up and he said that Mr. Hoffa said he owned the coal."

Eckhart and his attorney visited Hoffa who asserted his ownership of the coal and told them of his agreement with Lloyd Shaw in 1934. The Eckharts bought the property anyway. The consideration was $3,750.00.

Ayres drove in to the coal on the left of the right-of-way and continued mining it until April of 1960, when the Eckharts forced him to shut down. The trespass suit was filed 3 October 1961.

Two years later Defendants filed general issue pleas and a plea of limitations. Six months later depositions were taken by each party. Plaintiffs examined Hoffa at great length and elicited from him a detailed account of his negotiations with Lloyd Shaw, including the verbal agreement to substitute coal on the left for what was missing on the right. A few months thereafter the case was tried.

All of Plaintiffs' contentions arise out of the following excerpts from the direct examination of Hoffa:

"Q. Then what did you do after that when you found it [the coal] was missing? A. I made it my business to go up to Lloyd Shaw's. He had lived above me in the town of Moscow and I got in touch with him.

"Q. Did you tell him the coal was gone? A. I told him, I said, Lloyd, you sold me a tract of coal—

"(Mr. Barnett) I object to that.

"(The Court) He is only testifying to what he said up to this point.

"(Mr. Geppert) Go ahead.

"A. Now, Lloyd, I said, you know you sold me something that you didn't have and that is fraud and I will be compelled to sue you for fraud. The only way you can fix that matter up is replace that, give me coal beyond that heading that you give me through there and make up for what you have sold me. I have to have this or, I said, I will be compelled to sue you and I don't want to do that because we are friends. He said, Mr. Hoffa—

"(Mr. Barnett) I object.

"(The Court) The objection will be sustained.

"(Mr. Geppert) One moment, your Honor, we have some authorities we would like to present to the Court.

"(The Court) We are now speaking of the Dead Man's Statute; is that correct? I assume that is the objection.

"(Mr. Barnett) That is the first one.

"(The Court) I sustained the objection.

"(Mr. Geppert) If the Court please, I would like to have the opportunity to present some authorities."

Then followed a discussion between the Court and Mr. Geppert, Defendants' counsel, concerning the effect of Md. Code Ann. Art. 35, Sec. 3 (Supp. 1964), during which counsel cited pertinent decisions of this Court.

"(The Court) Just a minute, Mr. Geppert. Assuming that you are right, and it sounds like that case would bear you out, as regards to the Dead Man's Statute, what about hearsay?

"(Mr. Geppert) That is another point. I have two other cases.

"(The Court) I am satisfied about the Dead Man's Statute."

\* \* \*

"(The Court) I am satisfied on that score. Do you have any further objections?

"(Mr. Barnett) No, we would like to except.

"(The Court) Yes, certainly, that is automatic. But I am concerned about the hearsay evidence rule."

Mr. Geppert thereupon persuaded the court that the proffered testimony was admissible as an exception to the hearsay rule.

"(The Court) Repeat the question and, Mr. Hoffa, you may answer."

\* \* \*

"A. Lloyd Shaw, the first thing he said to me when we come to that point, he said, Mr. Hoffa, I don't know what father did, he says, he must have leased this coal out to somebody else and, he says, I want to make good, he says, I want to be right, I want to make good. Now, we own the coal on the northeast side of the heading, he says, when you come to it why not take out, he says enough coal to cover this. Would that be satisfactory? I said, yes, sir, I don't care. He said, I have no money, he says, I can't refund this but I will be glad to furnish the coal. I said that will be perfectly all right with me, Lloyd, yes, sir, we will do that."

Plaintiffs contend that the admission of Hoffa's testimony concerning the oral agreement with Shaw constitutes reversible error and they assign as reasons therefor: first, a special plea of justification was not filed as required by Maryland Rule 342 c 2(g); second, the rule prohibiting the use of parole evidence to vary the terms of a written contract is violated; third,

an attempt to convey an interest in land by oral agreement is contrary to the provisions of Sec. 1 of Art. 21 of the Code which requires the execution, acknowledgment and recording of a deed; and fourth, the hearsay rule requires its exclusion. These contentions are made by Plaintiffs for the first time in this appeal. No claim is made in respect of the court's ruling that Sec. 3 of Art. 35 of the Code did not apply to Hoffa's testimony.

Plaintiffs did object to the admission of Hoffa's testimony and ordinarily this would have been sufficient to support their present contentions because under the existing rule (Maryland Rule 522 d 1) it is not necessary to state the grounds for objections to evidence unless requested to do so by the court. We think the court made such a request. It is interesting to note that when Plaintiffs' counsel objected, the trial judge, reacting almost automatically to apparent and imminent hearsay testimony, sustained the objection. Counsel for the Defendants immediately challenged the ruling and asked leave to present his views of the applicable law. At this point the court became very much interested in the grounds for the objection and he ventured the assumption that Plaintiffs' counsel had in mind Sec. 3 of Art. 35 of the Code (the Dead Man's Statute). Plaintiffs' counsel agreed and indicated he had in mind additional grounds. After Defendants' counsel concluded the court conceded that he was persuaded by the presentation but he expressed concern about the hearsay rule. Plaintiffs' counsel made no attempt to convince the court to stand by his original ruling and when asked if he had "any further objections" he said, "No, we would like to except." We are satisfied that the expression "further objections" as used by the court and as understood by Plaintiffs' counsel means "further grounds for objections."

Having been called upon to specify any grounds other than the Dead Man's Statute and having failed to do so, Plaintiffs must be regarded as having waived the grounds they now ask us to consider. *Wolfinger v. Frey,* 223 Md. 184, 162 A. 2d 745 (1960); *Moore v. State,* 199 Md. 676, 87 A. 2d 577 (1952); *Carter v. Reardon-Smith Line,* 148 Md. 545, 129 Atl. 839 (1925); Maryland Rule 885. See also *Jackson v. Chesapeake & O. Ry. Co.,* 179 Va. 642, 20 S. E. 2d 489 (1942).

Despite the announced intention to state additional grounds

160

Plaintiffs at no time thereafter during the trial made any objection to Hoffa's testimony or, indeed, to anything else. They offered no request for instructions and they made no exceptions to the court's charge to the jury. This is somewhat difficult to understand in the light of the concluding words of the court's charge, which were, "On the other hand, if you believe that the Defendants had a right to remove the mineral in consequence of an agreement with Mr. Lloyd Shaw, then your verdict, of course, would be for the Defendants."

Plaintiffs knew that Defendants would rely heavily on Hoffa's claim that Shaw had substituted coal for the coal that was missing. Harry Eckhart knew it even before the property was purchased and it was recounted in great detail by Hoffa in his pre-trial deposition. They cannot have been unmindful of its importance. The means for its exclusion at trial were at hand but they failed to make use of them. We see no reason for disturbing the judgment of the trial court.

*Judgment affirmed. Costs to be paid by appellants.*