## WILT *v.* WILT ET UX.

[No. 164, September Term, 1965.]

130

*Decided March 31, 1966.*

The cause was submitted to HAMMOND, HORNEY, OPPEN-HEIMER and McWILLIAMS, JJ., and RAINE, J., Associate Judge of the Third Judicial Circuit, specially assigned.

Submitted on brief by *Jack R. Turney* for the appellant.

Submitted on brief by *Lewis R. Jones* and *W. Dwight Stover* for the appellees.

HORNEY, J., delivered the opinion of the Court.

In this action for trespass to real property and ancillary injunctive relief brought by Myrl Wilt and his wife (Myrl) against Marshall Wilt (Marshall) to settle the dispute as to the

location of the boundary line between their respective proper-
ties, the lower court found that Myrl had obtained title to the
disputed strip of land by adverse possession and Marshall ap-
pealed.

At one time the properties owned by the disputants had been
parts of a single tract of land belonging to Jesse Broadwater
and his wife (Jesse). In December of 1939 Jesse conveyed the
thirty-five acre tract now owned by Myrl to Max and Ezra
Broadwater (Max and Ezra) and later, in April of 1963, con-
veyed the remaining portion of the tract to Marshall and his
wife.

The deed to Max and Ezra described the thirty-five acre
tract as—

> "Beginning at a gum tree line extending South 61
> degrees 15 minutes E. 2200 ft., to a concrete block;
> then South thirty degrees & forty five minutes W.,
> 1550 ft., to a post in a stump; then North 29 degrees
> & thirty minutes W., 2150 ft., back to the gum tree.
> Containing thirty-five (35) Acres [,] with all posses-
> sions, rights and everything thereto pertaining. * * *."

From this description and the testimony of Jesse it may be as-
sumed that he intended to convey a triangular tract of land hav-
ing three straight sides. The first two sides, from "a gum tree"
to "a concrete block" and then to "a post in a stump" [1] are
easily locatable, but it is difficult to determine with certainty the
third side because the course and distance set forth in the deed,
"North 29 degrees & thirty minutes W., 2150 ft.," will not close
the triangular tract while the added call (disregarding the course
and distance) would close it.

When Max and Ezra, both of whom died prior to the pres-
ent controversy, took possession of the land a fence line in the
vicinity started at the "gum tree" and extended most of the dis-
tance to the "pine stump." The fence line, however, instead of
forming a straight boundary curved outward and thus increased
the area of the "triangular" tract. Max and Ezra are said to

---

1. The stump is sometimes referred to in the testimony as a
pine or hemlock stump. It was washed out by Hurricane Hazel and
the approximate location is now marked by a rock painted red.

have farmed the tillable portion of the land up to the fence during the time they were in possession and generally treated the line of the fence as the boundary line of their land. In June of 1954 they conveyed their fee simple interest in the property "together with the buildings and improvements thereon, and rights, roads, ways, waters, privileges and appurtenances thereunto belonging or in any wise *appertaining*" to Myrl. The deed to him recited the same description as was contained in the deed from Jesse to Max and Ezra.

Myrl took possession of the property immediately and continued to till the land "right to the fence." He also repaired the fence from time to time and considered it to be the third boundary line of the property. After Marshall purchased the adjoining property in April of 1963 he crossed the fence to the strip of land claimed by both parties and cut timber thereon. Myrl protested and when Marshall refused to stop his activity on the disputed strip, Myrl brought suit in February of 1964.

At the trial, Myrl was allowed to testify over the objection of Marshall, that when he (and his wife) purchased the property he had discussed the boundary line with the predecessors in title and was told by them that the fence line constituted the boundary line along the third side. The specific testimony admitted over objection was:

> "And they [the deceased predecessors in title] told me that this was as far [meaning the pine stump] as they had surveyed any lines, they just said to follow the fence line back to the gum tree, since everybody agreed that the fence run straight from that point back to the gum tree, it may have a little variation one way or the other, but it does go back."

That the third side of the triangular tract had not actually been surveyed was corroborated by Jesse, the former owner of the whole tract. He testified that the surveyor, instead of surveying the third boundary line, called it "a straight line" which "cut right in the fence" at the beginning and "then tapered into the fence at the upper end where the gum tree is." Jesse admitted that Max and Ezra might have tilled the lower end of the disputed strip without his knowing it, but was sure they

had never cut any timber on the upper end. Marshall, who was not familiar with the property owned by Myrl until 1954 when Max offered to sell him "what was on the outside of the fence," testified that in 1955 Jesse (his father-in-law) had told him that the boundary line ran from the pine stump to the gum tree.

The motions of Marshall for a "directed verdict" [2] were denied and judgment was entered in favor of Myrl.

### (i)

The first question presented by the appeal concerns the admission of the testimony of Myrl recounting the statement made by his predecessors in title. While the record shows that objection to the admission of the statement as evidence was based solely on the ground that it violated the provisions of § 3 of Article 35 of the Code, the so-called "dead man's statute," Marshall now contends that the testimony amounted to hearsay evidence which should have been excluded by the lower court and argues in this Court that it was reversible error to admit it over objection. Whether or not the question is properly before us would therefore seem to depend on the peculiar circumstances of this case.

At the colloquy which ensued between counsel for the respective parties and the trial judge when the court requested the grounds for the objection, counsel for Marshall, as stated above, based the objection to the admissibility of the testimony only on the ground that it would violate the dead man's statute. At the same time, however, counsel for Myrl contended that proof of the boundaries of land by the declaration of a deceased former owner thereof is an exception to the hearsay rule. And when the colloquy ended the lower court ruled that the testimony would not violate § 3 of Article 35 and overruled the objection to its admission as evidence.

As was pointed out in *Eckhart v. Ayres*, 240 Md. 153, 213 A. 2d 493 (1965), it is not necessary under the existing Maryland Rule (522 d 1) to state the grounds for objections to evi-

---

2. The case having been tried on the facts by the court, no motion for a directed verdict was required, but the entry of judgment as of course on the law and evidence was proper under Rule 564 b 1.

dence unless requested by the trial court, but when a request is made therefor, the objector should state all the reasons (if he has more than one) for objecting; for, if he does not, he would ordinarily be regarded as having waived any objections he had not stated. In the case at bar, however, where the lower court was fully aware of the reasons advocated by counsel for and against the admissibility of the evidence offered and ruled in favor of one contender against the other, we think both propositions of law should be considered briefly.

It is clear that the provisions of the dead man's statute are not applicable in this case because the testimony of a witness as to transactions with a deceased person can only be excluded under § 3 of Article 35 in a proceeding brought by or against an executor, administrator, heir, devisee, legatee or distributee of such decedent: this was not the situation in the instant case. See *Guernsey v. Loyola Federal Savings and Loan Association,* 226 Md. 77, 172 A. 2d 506 (1961), and cases cited therein.

And it is just as clear that the declarations of a deceased former owner of land are admissible as an exception to the hearsay rule to prove the boundaries thereof provided there was no controversy as to the boundaries at the time the declarations were made. See *Cadwalader v. Price,* 111 Md. 310, 73 Atl. 273 (1909), where it was said at p. 315: "There ought no longer to be any question in Maryland about the right to prove private boundaries by the declarations of deceased persons, subject, of course, to certain well recognized limitations." Later on, quoting *Dorsey on Ejectment,* 57-58, it was also said at p. 316 that while "boundaries may be proved by hearsay evidence" the *"declarations of living witnesses* cannot be received, nor the declarations of a person interested in establishing the fact." These, we take it, were the "well recognized limitations" referred to on p. 315. Certainly they do not, as counsel for Marshall contended below, include the provisions of the dead man's statute. All of the earlier cases and text authorities seem to have been cited or were referred to in *Cadwalader.* We have found only one later case on the point. It is *Wissler v. Elkins,* 149 Md. 318, 131 Atl. 444 (1925). There it was said that testimony with regard to the two foot strip in dispute "was admissible under the authority of *Cadwalader v. Price."* The case of *Marvil Package*

*Co. v. Ginther,* 154 Md. 213, 140 Atl. 95 (1928), cited by Marshall for the proposition that the mere statement of a neighbor that a given line or stone is a boundary should not be admitted without some satisfactory explanation of the source of his information is clearly distinguishable on the facts. In a case, such as this, where there was no controversy as to whether or not the fence was the boundary line at the time Max and Ezra told Myrl that it was the boundary line, it is clear that the testimony of Myrl was admissible.

(ii)

The second question concerns the sufficiency of the evidence to warrant the lower court finding that Myrl had acquired title to the strip of land in dispute by adverse possession. The claim is that there was no showing that the possession of Max and Ezra was of such character as would ever have ripened into title by adverse possession.

In order to establish title to land by adverse possession, the claimant must show that such possession was actual, notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted for a period of twenty years. *Gore v. Hall,* 206 Md. 485, 490, 112 A. 2d 675 (1955). See also *Hungerford v. Hungerford,* 234 Md. 338, 199 A. 2d 209 (1964) and *Peper v. Traeger,* 152 Md. 174, 136 Atl. 537 (1927).

Insofar as the predecessors in title were concerned, it is apparent that their possession satisfied all of the elements necessary for the acquisition of title by adverse possession except as to the length of possession. Likewise, the possession of Myrl satisfied all of the required elements except duration. Where, however, there is privity of estate between successive parties in possession, the possession of such parties may be tacked one to the other so as to get the required continuity for the prescribed period of time. *Spicer v. Gore,* 219 Md. 469, 476, 150 A. 2d 226 (1959) ; *Gore v. Hall, supra,* at p. 491 of 206 Md.

In the case at bar, where the strip of land in dispute was held adversely by Myrl for over nine years and by the predecessors in title for over fourteen years, making a continuous adverse possession of about twenty-three years, the lower court correctly held that Myrl had obtained title by adverse possession.

### (iii)

The third and final contention that the lower court gave preference to a "call of courses and distances" instead of recognizing a straight line as the boundary "between the natural monuments" is without merit. Having found that Myrl acquired title by adverse possession, it was not necessary for the lower court to make a finding on this point and we find nothing in the record to even suggest that the court ever indicated any such preference.

*Judgment affirmed; costs to be paid by appellant.*