# STEWART FRUIT COMPANY OF BALTIMORE CITY

*vs.*

# CHICAGO, MILWAUKEE & ST. PAUL RAILROAD COMPANY.

*Foreign Railroad Company—Liability to Suit.*

A foreign railroad company is not regularly doing business or exercising its franchises in the State, so as to be liable to suit therein, merely because it has an arrangement with a local railroad company by which the latter's agent sells tickets over the lines of the two companies, the local company issues bills of lading for freight to be transported over the two lines, and the local company collects the entire freight for shipments, originating on the line of the foreign company and delivered by the local company in the State, the foreign company having no property or office in the State, and having no person in its service soliciting business within the State.          pp. 65-69

A railroad corporation of this State is not the agent of a foreign railroad corporation, with which it does business as a connecting carrier, so as to justify the service of process upon it in a suit against the foreign corporation.          pp. 65-69

Nor is a ticket agent of the local corporation, who sells tickets over the lines of the two companies, an agent of the foreign corporation for the purpose of the service of process.  pp. 65-69

*Decided March 15th, 1923.*

Appeals from the Superior Court of Baltimore City (STANTON, J.).

Action by the Stewart Fruit Company of Baltimore City against the Chicago, Milwaukee & St. Paul Railroad Company. From two orders quashing writs of summons issued by plaintiff, it appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Hyland P. Stewart,* for the appellant.

*Duncan K. Brent,* with whom was *Allen S. Bowie* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the Court.

This suit was brought in November, 1921, in the Superior Court of Baltimore City by the Stewart Fruit Company of Baltimore City, a corporation, against the Baltimore & Ohio Railroad Company, hereinafter called the B. & O. Company, and the Chicago, Milwaukee & St. Paul Railroad Company, hereinafter called the Chicago Company, to recover the value of a carload of apples and loss of profit on same, which the declaration alleges was delivered in April, 1920, at Seattle, in the State of Washington, by the Wenatchee Valley Fruit Exchange to the Chicago Company for transportation and delivery over its line and connecting lines to the said exchange at St. Paul, in the State of Minnesota, and, before its arrival at St. Paul, was purchased by the plaintiff and the carrier notified to divert it from the City of St. Paul and to deliver it "on the lines of the Baltimore & Ohio Railroad at the City of Baltimore" to the shipper, "notify Stewart Fruit Company," but which the Chicago Company and its connecting lines failed to deliver to the plaintiff at Baltimore City.

The writ for the Chicago Company was served upon "Andrew G. Cromwell, Agent," whereupon said company, by Duncan K. Brent, its attorney, who appeared solely for the purpose, filed a motion to quash the writ of summons and dismiss the suit upon the grounds, (1) that at the time of the institution of the suit and service of said writ it was a non-resident corporation, and never had been engaged in doing business or exercising its franchises in the State of

Maryland. (2) "That it has not any resident agent, president, manager, ticket agent or any other officer within said State upon whom process can be served in accordance with the provisions of article 23, sec. 92, of the Public General Laws of Maryland." (3) That Andrew G. Cromwell, upon whom the writ was served, was a ticket agent employed solely by the B. & O. Company at Mt. Royal Station, in Baltimore, Maryland, and was not an officer, servant, agent or employee of the Chicago Company, and (4) that the assumption of jurisdiction by said court over it by virtue of the writ of summons in this case would be a denial to it of due process of law, as provided by the Fourteenth Amendment of the Constitution of the United States.

The plaintiff answered the motion, alleging that at the time of the service of the writ and the institution of the suit the Chicago Company was doing business and exercising its franchises in the State of Maryland; that it had a ticket agent and a freight agent and other officers within the State upon whom process could be served; that Andrew G. Cromwell, upon whom the writ was served, was a ticket agent selling tickets in Baltimore City over the Chicago Company's railroad in connection with his duties as agent of the B. & O. Company, "and actually sold to this plaintiff such a ticket of said two railroads as a connecting through passenger carrier and received the entire passage money for the same"; that the assertion of jurisdiction by the Superior Court over said company would not be a denial to it of due process of law, "but on the contrary * * * the cause of action in this case arose from a contract made in Seattle, Washington, for a through freight rate from Seattle, * * * to Baltimore City over its line and over the" B. & O. Company's line, "constituting a through trunk line from the two cities engaged in interstate commerce and under through rates as promulgated by the Interstate Commerce Commission and that the" B. & O. Company "was its agent to collect the entire freight from the through route and remit the"

Chicago Company's "share to it after said collection, and has since, and is now, so engaged in through traffic under joint through rates, and it is acting as the agent for the" B. & O. Company "for freight originating over the" B. & O. Company's "lines and collecting the entire freight at point of destination on the line of the" Chicago Company "and remitting the" B. & O. Company's "portion of said freight to it, and that they are likewise doing the same business, performing the same service and acting as agent in the same capacity in the transportation of passengers between the points on the lines of the two connecting carriers."

At the hearing of the motion, the Chicago Company proved by its secretary that it is a corporation of the State of Wisconsin; that it has no property in the State of Maryland, and has never "qualified" in Maryland to conduct business therein, and that so far as he knows it has never exercised "its franchise" in Maryland, and has no office in Maryland, and no agent in Baltimore City engaged in soliciting freight. H. E. Pierpont, traffic manager of the Chicago Company, having general supervision of the freight and passenger traffic of that company, testified that the company did not maintain an office, place of business or agency in Maryland; that it has no agent, officer, employee or ticket agent located in Maryland; that the company has no agent or employee in Baltimore City to whom a shipper of apples from Chicago to Baltimore could go to find out what the rates were, but that he would have to go to Philadelphia; that he had never heard of Andrew G. Cromwell, and that Mr. Cromwell was not an officer, agent or employee of the Chicago Company. H. H. Field, general solicitor and one of the officers of the Chicago Company, stated that the company had never "qualified in the State of Maryland as a non-resident corporation," and that it has never exercised its franchise, and has never had any railroad or any fixed property, in Maryland. Mr. Calloway, passenger traffic manager of the B. & O. Company, testified that Mr. Crom-

well was the ticket agent of the B. & O. Company at Mt. Royal Station, in Baltimore City, whose duties consisted in selling passenger tickets, and that his entire salary was paid by the B. & O. Company; that if a man wanted to go to some place off the line of the B. & O. Company and went to Mt. Royal Station to buy a ticket, Mr. Cromwell would first ascertain what railroad he wanted to go on and what route he preferred, then look up the train accommodations, let him select the railroad train he preferred, and then sell him a ticket to his destination; that that "method of procedure" applies to all railroads making connection with the B. & O. Company's road; that there is no particular arrangement with the Chicago Company; that the selection of the railroad is left to the passenger; that the B. & O. Company has to be neutral in reference to such selection, and that Mr. Cromwell's instructions are that in the conduct of the business he must not influence a passenger to use one connecting line rather than another; that there is a reciprocal arrangement between all railroads; that the B. & O. Company sells tickets over its own line and connecting lines, collects the whole fare, and after deducting the charges on its own line, sends the connecting lines their shares of the fare or mileage without any charge for selling the ticket over their lines, and that those lines reciprocate when they sell tickets from points on their lines to a point on the line of the B. & O. Company; that this arrangement exists with all railroads in the United States, and there is no difference in the arrangement between the B. & O. Company and the Chicago Company; that a monthly settlement is made by the various roads; that at the end of each month the accounting department of the B. & O. Company sends the Chicago Company a report showing how much is due it from tickets routed over its road, and the Chicago Company sends the B. & O. Company a report showing the amount due the B. & O. Company for tickets sold over its line, and the road shown by the accounting to be the debtor road sends the other road

a check for the amount due it; that before the B. & O. Company can sell a through ticket over the lines of other roads it has to secure from them a "concurrence," which is a form filed with the Interstate Commerce Commission showing that they concur in the fares and rates published by the B. & O. Company, and that the same rule applies to roads desiring to sell through tickets over the B. & O. Company's road. When shown a ticket from Mt. Royal Station, Baltimore, to Racine, Wisconsin, over the B. & O. Company's road, and over the Chicago Company's road from Chicago to Racine, and the printed statement thereon, "In selling this ticket and checking baggage hereon, this company acts only as agent and is not responsible beyond its own line," Mr. Calloway explained that the statement simply meant that the B. & O. Company was not responsible for accidents, etc., beyond its own line, and that it did not mean that it was not responsible to the Chicago Company for its share of the fare collected for the ticket.   Mr. Cromwell, upon whom the writ was served, testified that he sold the ticket referred to above for $30.37 and turned the money over to the B. & O. Company; that he sold the ticket according to the rate shown in the tariff; that his instructions are from the B. & O. Company, and that he collects the entire fare for it, and does not receive any instruction from the Chicago Company or know that company in the transaction; that he is the ticket agent of the B. & O. Company at Mt. Royal Station, and that that company pays all of his salary; that he does not solicit any business, but simply sells the ticket after the passenger tells him "where and how he wants to go." Mr. Shumate, general freight traffic manager of the B. & O. Company, testified that the "initial line that originates the freight, publishes the through rate * * * ; before they can publish a through rate they have to get the concurrence of the lines over which the rates apply; that is the form of concurrence which has been prescribed by the Interstate Commerce Commission"; that when a car arrives over the B. & O. Company's road, and

the freight has not been prepaid, the billing shows the weight, the rate and total charges, and that the B. & O. Company, after checking the charges against the tariff to see if they are correct, collects the charges as the "delivering line"; that the B. & O. Company is a party to a tariff which shows the amount to be collected, and that it is its duty to collect the total charge; that in doing so it is complying with the law "as applying to the B. & O. R. R.," and that the B. & O. Company does not collect it "as the agent for anybody," but collects it because it is a party to the total charge, and the share belonging to the other roads is sent to them monthly; that the railroads have monthly settlements according to the general plan applicable to the passenger business; that there are a good many cars of fruit shipped from Seattle and the West, and that there are generally some cars of the Chicago Company on the B. & O. Company's line; that he knows Mr. Lincoln, but does not know Mr. Phyle, and does not know that either of them ever came to his office to see him; that the relations of the B. & O. Company with the Chicago Company "are the same as with all other roads in the United States," and that the question of rates is governed by the tariffs filed with the Interstate Commerce Commission.

Mr. Thirkle, who was employed by the Columbia Paper Box Company in Baltimore City, testified that his company had been shipping paper boxes in carload lots to Kansas City, and that about January 9th, 1922, he received a letter on the stationery of the Chicago Company requesting that he favor that company's road with a certain amount of freight moving from Baltimore to Kansas City, and that about the first week in February following Charles H. Phyle came to his office, presented his card, and said that he was traveling freight agent of the Chicago Company, and that he came to pay a personal visit and to repeat the request made in said letter. The letter referred to purported to come from the office of "General Agent, Traffic Department" of the Chi-

cago Company, at Philadelphia, Pennsylvania, and was signed by "Geo. J. Lincoln, General Agent." Mr. Thirkle further testified that, shortly after Mr. Phyle's visit, his company shipped a car to Kansas City and routed it over the Chicago Company's road, and that since then his company has continued to send its freight for Kansas City over that road; that he never saw Mr. Lincoln, and that Mr. Phyle is the traveling freight agent of the Chicago Company. Mr. Stewart, president of the plaintiff company, identified the bill of lading for the apples referred to in the declaration, which he stated was attached to the draft he paid for the apples, and further testified that Mr. Phyle solicited freight from him some time in the early part of 1922, but that he could not recall whether he was solicited for freight over the Chicago Company's road prior to that time; that he wrote the freight claim agent of the Chicago Company in Chicago in July, 1921, in regard to the apples mentioned in this case, and that he received a reply from said agent, and also another letter from him later, stating that the net proceeds of the sale of said apples amounted to $1,276.76; that that amount had previously been offered to the plaintiff in settlement of its claim; that the sale had been conducted in accordance with the general rule observed by all carriers for the benefit and protection of all parties concerned, where delivery of highly perishable shipments is made impossible by conditions such as arose in this instance, and suggesting that any further correspondence in connection with the claim be "handled direct with" Mr. Glessner, "F. C. A" of the B. & O. Company.

Upon the evidence to which we have referred the court below on June 10th, 1922, quashed the writ of summons as to the Chicago Company, whereupon the plaintiff caused another writ against that company to be issued and served upon the B. & O. Company, as the agent of the Chicago Company, and upon Duncan K. Brent, as "Agent and Attorney in the employ" of the Chicago Company. Mr. Brent

refused to accept the service, and the Chicago Company filed a motion to quash the writ and dismiss the suit against it on the grounds set out in its previous motion, and because Duncan K. Brent was employed solely by the B. & O. Company and was not an officer, servant, agent or employee of the Chicago Company, and because the B. & O. Company is a corporation entirely separate and distinct from the Chicago Company, and is not an agent of the Chicago Company. The motion was answered by the plaintiff, and was heard by agreement on the testimony produced at the hearing of the former motion and an affidavit by Mr. Brent that he was not an officer, servant, agent or employee of the Chicago Company, but was employed solely by the B. & O. Company at a yearly salary, "which is entirely paid by" the B. & O. Company; that he entered his appearance specially for the Chicago Company solely for the purpose of filing the motion to quash the writ of summons; that he did so "through the comity that exists between various railroad companies in the United States," and that he had not and will not receive any fee or any other compensation for such special appearance.

The court below, on the 25th of October, 1922, quashed the second writ of summons and entered judgment for the Chicago Company for costs. Appeals were duly entered from this order and the order of June 10th quashing the first writ, and the record contains an agreement of counsel that both appeals should be included in one record and be heard together.

Section 92 of article 23 of the Code is as follows:

"Any person or corporation, whether a resident or non-resident of this State, may sue any foreign corporation regularly doing business or regularly exercising any of its franchises herein for any cause of action. * * * If such corporation has a resident agent authorized and prepared to accept service as provided by section 93 of this article, such process shall be

served upon him. If the corporation has no resident
agent so authorized and prepared, process may be
served * * * upon any president, manager, director,
ticket agent or officer of the corporation, or upon any
agent or other person in its service."

In this classe of cases two questions arise: (1) Was the
corporation regularly doing business or regularly exercising
any of its franchises within the State? And (2) was the
writ of summons duly served upon its agent or other person
in its service?

In *State* v. *Pennsylvania Steel Co.*, 123 Md. 218, this
Court said: "The difficulty in these cases is in determining
what acts of the foreign corporation constitute 'doing busi
ness' in the State, so as to render it liable to be sued in such
State. So far as we have been able to find, there has been
no general definition of the term 'doing business' in the
sense that we are now dealing with that term. This ques-
tion, it seems, must be largely determined upon the facts
of each individual case, and so it must be determined in this
case." See also *St. Louis S. W. Ry.* v. *Alexander*, 227 U. S.
218. And in the more recent case of *Baden* v. *Washington
Loan & T. Co.*, 133 Md. 602, JUDGE URNER, in considering
the first of the questions mentioned, said: "In 19 Cyc. 1268
it is said to be the general conclusion of the courts that 'iso-
lated transactions, commercial or otherwise, taking place
between a foreign corporation domiciled in one state and
citizens of another state, are not a doing or carrying on of
business by the foreign corporation within the latter state,
even, according to the weight of authority, where the trans-
action is of such a character as to constitute a part of the
ordinary business of the corporation.' The effect of the
decisions on this subject is thus stated in 12 *Ruling Case
Law*, p. 69: 'It seems to be the consensus of opinion that a
corporation, to come within the purview of most statutes
prescribing conditions on the right of foreign corporations

to do business within the state, must transact therein some substantial part of its ordinary business, which must be continuous in the sense that it is distinguished from merely casual or occasional transactions.' "

The statement quoted with approval by JUDGE URNER from 12 *R. C. L.* would seem to be especially applicable where the language of the statute, as in this case, is not doing business, but "*regularly* doing business or *regularly* exercising any of its franchises," etc.

We do not understand the appellant as contending that the testimony of Mr. Thirkle and Mr. Stewart that Mr. Phyle, an agent of the appellee, with headquarters in Philadelphia, called on them once in the year 1922 to solicit freight over the lines of the appellee shows that the appellee was regularly doing business or regularly exercising its franchises within this State, but it insists that the selling of tickets by Mr. Cromwell over the B. & O. Company's line and the line of the appellee, the collection of the money for them and turning it over to the B. & O. Company for the appellee, and the issuing by the B. & O. Company of through bills of lading over its line and the line of the appellee, and the collection of freight by the B. & O. Company and accounting for the same to the appellee, shows conclusively that the appellee was not only regularly doing business and exercising its franchises within the State, but also shows that Mr. Cromwell and the B. & O. Company were the agents of the appellee in the conduct of that business.   He relies upon the case of *Central of Georgia Ry. Co.* v. *Eichberg,* 107 Md. 363.   A careful examination of that case will show, however, that it does not go to the extent claimed by the appellant.   There the foreign corporation, the Central of Georgia R. Co., and the Merchants and Miners Transportation Company jointly appointed an agent to solicit freight over the "Central Savannah Line," which had no distinct legal entity, but was simply the name of a route made up by the said connecting carriers.   This agent, whose salary was

paid by said companies, had his office in a building of the Merchants and Miners Transportation Company, at the southeast corner of Light and German Streets, in Baltimore City, on one of the windows of which was the sign, "Central Savannah Line, via Central of Georgia Railway and the Merchants and Miners Transportation Company," and as the representative of these connecting carriers was regularly engaged in soliciting, in Baltimore City and the surrounding territory, "traffic for and over" said line, and the procurement of freight for transportation over the same. By an arrangement between the two companies, tickets over the "Central Savannah Line" were sold and bills of lading issued, by the Merchants and Miners Transportation Company, which collected the entire fare or freight. Upon those facts the Court held that the Central of Georgia Ry. Co. was doing business within the State, and that the writ was properly served upon said agent. In the case at bar, the appellee does not maintain an office in this State, and does not have in this State any person or corporation in its service engaged in soliciting or procuring in this State freight for transportation over its lines or any other business for the appellee. To hold that the selling in this State of through tickets over the lines of the B. & O. Company and the Chicago Company by the ticket agent of the B. & O. Company, and the issuing of bills of lading by the B. & O. Company for freight to be transported over its line and the line of the Chicago Company, at the rates fixed by the published tariffs, and the collection by the B. & O. Company of the entire freight for shipments originating on the line of the Chicago Company and delivered in this State by the B. & O. Company, is sufficient to show that the Chicago Company is doing business and exercising its franchises within this State, and that the ticket agent who sold such tickets and the B. & O. Company are the agents or persons in the service of the Chicago Company, within the meaning of the statute quoted, would, in effect, be holding that practically every railroad

in the United States is doing business and exercising its franchises within this State. The *Central of Georgia Ry. Co.* case is not susceptible of such a construction, nor do we find any case justifying the contention of the appellant.

In the case of *St. Louis S. W. Ry.* v. *Alexander, supra,* the Supreme Court of the United States said:

"In the court below it was adjudged that the so called Carmack Amendment, under the circumstances here detailed, had had the effect of making the corporation liable to suit in New York and, because of the agency within New York of the connecting carrier, effected by that statute, must be held to be there present and subject to service of process. In view of the recent consideration of the Carmack Amendment in this court it is unnecessary now to enter upon any extended discussion of it. The object of the statute was to require the initial carrier receiving freight for transportation in interstate commerce to obligate itself to carry to the point of destination, using the lines of connecting carriers as its agencies, thus securing for the benefit of the shipper unity of transportation and responsibility. *Atlantic Coast Line R. R. Co.* v. *Riverside Mills,* 219 U. S. p. 203. The provisions of the amendment had the effect of facilitating the remedy of the shipper by making the initial carrier responsible for the entire carriage, but the amendment was not intended, as we view it, to make foreign corporations through connecting carriers liable to suit in a district where they were not carrying on business in the sense which has heretofore been held necessary to confer jurisdiction.

"We reach the conclusion that this case is to be decided upon the principles which have heretofore prevailed in determining whether a foreign corporation is doing business within the district in such a sense as to subject it to suit therein."

The facts in the last mentioned case are not unlike the facts in the *Central of Georgia Ry. Co.* case, and the Supreme Court held that the railroad company, which maintained an office and had a freight agent in New York, was

doing business in New York and liable to suit there, but it refused to adopt the view of the lower court that a delivering carrier becomes, under the Carmack Amendment, such an agent of the initial carrier as to make a foreign corporation subject to suit in a state where it was not carrying on business in the sense which had theretofore been held necessary to confer jurisdiction.

Our conclusion upon all the facts in this case is that the Chicago Company was not regularly doing business or regularly exercising its franchises within this State, and we must therefore affirm the orders of the court below.

*Orders affirmed, with costs.*