CHESAPEAKE SUPPLY & EQUIPMENT CO. AND
R. E. LINDER STEEL ERECTION CO., INC., ETC.
*v.* MANITOWOC ENGINEERING CORP.

[No. 7, September Term, 1963.]

556

*Decided November 6, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Mitchell Stevan,* with whom were *Sagner, Stevan & Harris* on the brief, for Chesapeake Supply & Equipment Co., part of appellants.

*J. Royall Tippett, Jr.,* with whom were *Hinkley & Singley* on the brief, for R. E. Linder Steel Erection Co., Inc., part of appellants.

Submitted on the brief by *William O. Doub, Niles, Barton, Gans & Markell* for Royal Insurance Co., Ltd., other appellants.

*Norman E. Burke* and *Benjamin C. Howard,* with whom were *Miles & Stockbridge* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

The question presented on these appeals is whether a Wisconsin corporation that manufactured and sold mobile truck cranes through a Maryland distributor to purchasers in this State is amenable to the suits of the distributor and a purchaser, either because the foreign corporation was doing business in Maryland or because the contract between the parties was made here.

The original action was instituted by R. E. Linder Steel Erection Company, Inc. (Linder or purchaser), a Maryland corporation, to the use and benefit of itself and its insurer against the Chesapeake Supply and Equipment Company

(Chespeake or distributor), another Maryland corporation, for damages resulting from the collapse of a Manitowoc crane purchased by Linder through the distributor. Chesapeake impleaded the Manitowoc Engineering Corporation (Manitowoc or manufacturer) as a third party, and Linder amended the action to join Manitowoc as a defendant. Manitowoc appeared and moved to quash the writs of summons for lack of jurisdiction. The appeal is from the judgments of *non pros* entered by the lower court upon its granting of the motions to quash.

Manitowoc is a manufacturer of heavy equipment with its principal office and manufacturing facilities in Manitowoc, Wisconsin, and sells its products through distributorship agreements with local retail dealers. During the period between October of 1956 and July of 1961, Manitowoc entered into three such agreements (all of which were similar though not identical) with Chesapeake, which had its principal place of business in Baltimore City. Besides being a local distributor for Manitowoc, Chesapeake sold heavy equipment for some twenty other manufacturers.

The distributorship agreements provided in pertinent part that Chesapeake was not the agent of Manitowoc; that all orders taken by Chesapeake were to be submitted, together with a report on the financial condition of the purchaser, to Manitowoc for final acceptance or rejection; that Manitowoc had the right to fix the price and terms on which all sales were to be made by Chesapeake and no sales were to be made on any other terms and conditions; and that Chesapeake was to stock an adequate supply of replacement parts for servicing the territory allotted to it by Manitowoc, which included all of Maryland except Alleghany and Garrett counties, eight counties (reduced to four in 1960) in Virginia, three counties in West Virginia and the District of Columbia.

In January of 1957, Chesapeake entered into negotiations with Linder for the sale of a crane. As a result of a proposal made by Chesapeake and accepted by Linder on January 21, 1957, Chesapeake sent Manitowoc on January 28, 1957, a written purchase order for a crane, in which neither the price nor the terms of sale were mentioned. Manitowoc, acting in accordance with the distributorship agreement then in force, declined

to "bill" or accept the order until it had been paid a deposit of 10% and had been assured that payment of the balance of the purchase price would be made on presentation of sight draft with bill of lading attached. Thereafter, the negotiations between Chesapeake and Linder having been resumed, certain changes were made in some of the specifications relating to the crane which entailed an increase in the original purchase price quoted by the distributor to the purchaser in the first proposal. While the further preliminary negotiations were in progress between the distributor and the purchaser, the distributor communicated frequently with the manufacturer by mail, telephone and telegraph concerning the purchase price and terms of sale and with respect to expediting the order for the crane to meet the shipping date promised by the distributor. Finally, the revised specifications and purchase price were restated in a second proposal made by Chesapeake and accepted by Linder on February 25, 1957. On the same day, the distributor, in a letter to the manufacturer, confirmed the telecommunication revisions of the original purchase order, enclosed a check for the required 10% deposit, advised the manufacturer that the purchaser had agreed to pay the balance upon presentation of sight draft at its bank,[1] and instructed shipment of the crane by fast freight direct to the purchaser instead of to the distributor as previously directed.

Linder's revised offer to purchase the crane was not accepted by Manitowoc in writing and the record is silent as to when

---

1. There is a conflict in the evidence as to when and where agreement was reached as to payment of the balance by sight draft. According to Linder, agreement was not finally reached until March 5, 1957, while the president of Linder was in Manitowoc. According to the documentary evidence (the letter from the distributor to the manufacturer dated February 25, 1957), Manitowoc was advised by Chesapeake that payment by sight draft at the National Central Bank in Baltimore was satisfactory to Linder. But when the president of Linder was confronted with the documentary evidence on cross examination at the hearing, he frankly admitted that the matter of a sight draft must have been discussed and agreed upon "as of at least February 25, 1957."

the construction or assembling [2] of it was commenced. However, work thereon was in progress, and was nearing completion, when the president of Linder and a representative of Chesapeake visited the Manitowoc plant on March 5, 1957, to inspect the crane before it was shipped. The crane, having been shipped f.o.b. Manitowoc on March 7, 1957, arrived in Baltimore on March 25th, and Linder paid the sight draft and the freight due.

When the crane was delivered in Baltimore, an employee of Manitowoc was present and helped unload and reassemble it and instructed Linder's operator how to use it. Having done so, the employee immediately left the state. In May of 1957, after the crane had collapsed, another Manitowoc employee helped repair the damaged crane. The repairman came to Baltimore at the request of Chesapeake and was paid by it.

In February of 1959, Chesapeake sold another Manitowoc crane to the Arundel Corporation. During the preliminary negotiations for the sale, a district manager for Manitowoc residing in Pennsylvania (who often visited Chesapeake "just to make Chesapeake conscious of Manitowoc") came into Maryland and assisted in negotiating the sale. Other than not requiring a deposit and payment of balance on sight draft and shipment to Chesapeake, the sale to Arundel was accomplished in substantially the same manner as the sale to Linder. Upon delivery of the Arundel crane, an employee of Manitowoc was again present to supervise unloading and assembly, and to instruct Arundel's operator, after which the employee left the state.

The underlying controversy concerning the jurisdiction of the lower court over the foreign corporation arose when the original parties to this action attempted to bring Manitowoc into the action under the rule relating to third-party practice. This presents the questions on appeal (i) as to whether the foreign corporation was "doing business" in Maryland and (ii) as to whether the contract was "made" in this State.

---

**2.** The automotive "carrier" on which the Manitowoc crane was mounted was constructed for Manitowoc by another manufacturer of heavy equipment.

(i)

We think that Manitowoc was not "doing business" in this State within the meaning of Code (1957), Art. 23, § 92(a).

The general rule is that a foreign corporation is doing business within a state when it transacts some substantial part of its ordinary business therein. Cases (other than those hereinafter cited) which have arisen under what is now § 92(a), *supra*, include, among others, *Crook v. Girard Co.*, 87 Md. 138, 39 Atl. 94 (1898); *Central of Georgia R. Co. v. Eichberg*, 107 Md. 363, 68 Atl. 690 (1908); *Stewart Fruit Co. v. C., M. & St. P. R. Co.*, 143 Md. 56, 121 Atl. 837 (1923); *Carter v. Reardon-Smith Line*, 148 Md. 545, 129 Atl. 839 (1925); *Kahn v. Maico Co.*, 216 F. 2d 233 (C.A. 4th 1954); and *Johns v. Bay State Abrasive Products Co.*, 89 F. Supp. 654 (D.C. Md. 1950). In *State use of Bickel v. Penna. Steel Co.*, 123 Md. 212, 218, 91 Atl. 136 (1914), it was said that the question whether or not a foreign corporation is doing business within a state "must be largely determined upon the facts of each individual case." Necessarily, this requires careful consideration of the nature and extent of the business activities conducted by or on behalf of the foreign corporation in the forum state. *Blount v. Peerless Chemicals* (P.R.), 316 F. 2d 695 (C.A. 2nd 1963).

When this is done in the instant case, it is at once apparent that the holding in the case of *Feldman v. Thew Shovel Co.*, 214 Md. 387, 135 A. 2d 428 (1957), must control the decision in this case on the point of law presently being considered. As we see it, the factual situation in *Thew* was so similar to the factual situation here that it is almost impossible to rationally distinguish the cases on the facts. Indeed, a comparative analysis of the methods of operation employed by both corporations in making sales of their products in Maryland were, for the most part, strikingly identical. There are, of course, some variations between the factual situations in the two cases, but in some instances it appears that Manitowoc had even less contact with this jurisdiction than did *Thew,* particularly with respect to the number of sales made within specified yearly periods. On the whole the facts in *Thew* and in this case are so analogous that it

would be tautological to repeat them. Nor would it serve any useful purpose to compare the facts in this case with similar facts in the *Thew* case.

With respect to the claims of the appellants that certain activities on the part of the appellee constituted doing business in this State, we deem it sufficient to say that we find nothing in the record to show that Manitowoc exercised such domination and control over Chesapeake as would bring the activities of Manitowoc within the doctrine of *Thomas v. Hudson Sales Corp.,* 204 Md. 450, 105 A. 2d 225 (1954). Furthermore, we think that the activities of the district sales manager, in regularly visiting Chesapeake to keep it "conscious of Manitowoc" and in assisting Chesapeake to negotiate the sale of the Arundel crane, were not such as would subject Manitowoc to suit in Maryland. Cf. *G. E. M. Inc. v. Plough, Inc.,* 228 Md. 484, 180 A. 2d 478 (1962). We also think that the activities of Manitowoc employees, in unloading and assembling the Linder and Arundel cranes and in instructing the future operators thereof, were merely incidental to sales which had been made in interstate commerce and did not make Manitowoc amenable to suit in Maryland. See *Vulcan Steam Shovel Co. v. Flanders,* 205 Fed. 102 (D.C. Mich. 1913). See also 23 Am. Jur., *Foreign Corporations,* § 379; 17 Fletcher, *Corporations* (1960 Rev. Vol.), § 8412; and the book entitled *What Constitutes Doing Business* (1963), at p. 52, published by the Corporation Trust Company. Nor was Manitowoc amenable to suit because one of its employees came into Maryland and helped repair the Linder crane, for this activity was but an isolated act that did not constitute "doing business."

We hold that under the facts in this case Manitowoc was not doing business in Maryland.

(ii)

Nor was the contract with Manitowoc for the sale of the crane "made" in Maryland within the purview of Art. 23, § 92(d).

When the original purchase order, containing the initial specifications for the crane without mentioning either the price or terms of sale, was received by Manitowoc, it notified Chesa-

peake that it would not accept the order until it had been paid the customary deposit and had been assured that the balance would be paid on delivery. As a consequence, Chesapeake renewed its negotiations with Linder as to the purchase price and terms of sale. During these negotiations, Linder made certain changes in the specifications relating to the crane which necessitated further communications between Chesapeake and Manitowoc concerning the specifications and purchase price as well as the terms of sale and shipping instructions. After Linder had agreed to comply with Manitowoc's requirements as to the terms of sale and after all details (including payment of the 10% deposit and assurances as to payment of balance on sight) had been "finally ironed out," the specifications and purchase price were restated by Chesapeake in another "proposal" to Linder on February 25, 1957. Therein reference was made to the "revised quotation" of price and shipment "f.o.b. factory." The proposal was "accepted" by Linder and returned to Chesapeake with its check for $4446.50 to complete the 10% deposit, of which $2000 had been previously paid. On the same day, Chesapeake, in a letter to Manitowoc, enclosed its check for $6446.50 "covering the down payment on [its] purchase order." The letter concluded with the statement that the representatives of Linder and Chesapeake would "arrive in Manitowoc on March 5th to discuss [Linder's] machine and if there are any questions, they can be straightened out at that time."

In essence, it is contended that Manitowoc made Chesapeake its agent to receive the balance of the 10% deposit and to enter into a binding contract in Maryland with Linder for the sale of the crane. We do not agree. The only legal relationship between Manitowoc and Chesapeake was established by the distributorship agreements, and there is no evidence that Manitowoc had allowed the distributor to act as its agent in this instance. Nor is this a case of an undisclosed principal. The president of Linder knew that he was buying a Manitowoc crane and that Chesapeake was a distributor of Manitowoc equipment. There was no evidence that he thought, or was justified in thinking, that Chesapeake had authority to enter into a binding contract in Maryland on behalf of Manitowoc.

The general rule is well settled that persons dealing with an

alleged agent are put on inquiry as to the extent of his authority. *Metropolitan Club v. Hopper, McGaw & Co.,* 153 Md. 666, 139 Atl. 554 (1927) ; *Brager v. Levy,* 122 Md. 554, 90 Atl. 102 (1914) ; *Lister v. Allen,* 31 Md. 543 (1869). The corollary to this rule is that the scope of an agent's apparent authority governs the rights of third persons against the principal. Apparent authority is that authority which the principal has held the agent out as possessing or which he is by his actions estopped to deny. *Penowa Coal Sales Co. v. Gibbs & Co.,* 199 Md. 114, 85 A. 2d 464 (1952). See also *Salvatorian Mission v. Horn,* 210 Md. 475, 124 A. 2d 268 (1956). Chesapeake was the distributor for some twenty other manufacturers besides Manitowoc. The president of Linder testified that he had had dealings with Chesapeake for several years before "this crane sale." When a salesman for Chesapeake heard that Linder was in the market for a new truck crane, he supplied the president of Linder with "Manitowoc literature," told him that Chesapeake "represented" Manitowoc and "had a nice crane to offer." The president of Linder further testified he had "always liked Manitowoc" and that he "was sold almost before they showed me the literature." There is nothing in the record to even suggest that Chesapeake had apparent authority to contract.

Actually, Chesapeake had no authority at all to bind Manitowoc in Maryland. The current distributorship agreement expressly provided that Chesapeake had no authority to bind or obligate Manitowoc "in any manner whatsoever" and that all orders taken or received should be immediately forwarded "for acceptance or rejection, together with a report on the financial condition of the party who gave said order." Furthermore, Manitowoc expressly reserved the right to "either accept or reject such order" and to so advise Chesapeake. The mere fact that Manitowoc gave a firm price to Chesapeake, and required a down payment of 10% and the balance in cash on delivery f.o.b. the factory in Wisconsin, did not amount to a modification or change in the basic agreement so as to enlarge the very limited authority of Chesapeake in this one particular instance. There is no real inconsistency between the act of quoting a price and the reservation of a right to reject the offer when made.

Chesapeake was no more than a soliciting agent. A written agreement, of course, may be modified by a subsequent oral agreement, but the oral modification must be established by a preponderance of the evidence. See *Cole v. Wilbanks*, 226 Md. 34, 171 A. 2d 711 (1961); *Freeman v. Stanbern Const. Co.*, 205 Md. 71, 106 A. 2d 50 (1954). This was not done.

It was also argued that the evidence implies a waiver of Manitowoc's right to reject the purchase order. Waiver is a term susceptible of many different meanings. See 5 *Williston on Contracts*, § 679 (3d. ed.). There is here no element of promissory estoppel. Linder was not deceived as to the extent of Chesapeake's authority. Insofar as the question of intention to waive is one of fact, the finding of the trial court would seem to be conclusive. In any event, we think the evidence was insufficient to show a modification of the basic agreement so as to convert the distributor into an unlimited agent to effect a single sale.

It was further contended that even if Chesapeake was not Manitowoc's agent it must be found that the contract was made in Maryland because Manitowoc's refusal to accept Linder's offer of January 28, unless certain conditions were first complied with, was in effect a conditional acceptance constituting a counter-offer which Linder accepted in Maryland on February 25. From the record, however, it is clear that the negotiations between the parties prior to the acceptance of the last "proposal" by Linder on February 25, were merely preliminary as to every term in the contract. Not only had no agreement been reached as to a purchase price and as to the payment thereof, but the subsequent change in specifications relating to the crane necessitated further negotiations with respect to the purchase price. The sale of the crane was therefore contingent on Manitowoc and Linder arriving at an agreement as to the terms of payment and as long as negotiations were pending as to this material matter, no contract existed since there had been no meeting of the minds of the parties. *Beck v. Bernstein*, 198 Md. 244, 81 A. 2d 608 (1951). See also *Peoples Drug Stores v. Fenton*, 191 Md. 489, 62 A. 2d 273 (1948).

As we see it, the sending of the letter of February 25, from Chesapeake to Manitowoc, confirming the fact that the revised specifications and purchase price had been accepted by Linder,

and enclosing its (Chesapeake's) check to cover the deposit or down payment, constituted the offer from Linder to Manitowoc for the purchase of the crane. See 1 Corbin, *Contracts,* § 82. This offer was accepted by Manitowoc in Wisconsin, and it is clear, we think, that the last act that made the transaction a binding contract was not the *receipt in Maryland* by the distributor of the purchaser's check payable to Chesapeake for the balance of the down payment, but, instead, it was the *receipt in Wisconsin* by the manufacturer of the distributor's check payable to Manitowoc for the full amount of the 10% deposit and the manufacturer's beginning to assemble the crane, *Duplex Envelope Co. v. Baltimore Post Co.,* 163 Md. 596, 163 Atl. 688 (1933), that finalized the contract of sale. *Sun Insurance Office v. Mallick,* 160 Md. 71, 153 Atl. 35 (1931). See also *Compania De Astral v. Boston Metals Co.,* 205 Md. 237, 107 A. 2d 357 (1954), *cert. den.* 348 U. S. 943 (1955). Acceptance may be evidenced by acts as well as words, and notification of acceptance is not essential to the formation of a contract. See *International Filter Co. v. Conroe Gin, Ice and Light Co.,* 277 S. W. 631 (Tex. 1925). Indeed, it may well be, in view of the details left open to be "straightened out" that the sale was not finally consummated until the representatives of Chesapeake and Linder arrived in Manitowoc (Wisconsin) on March 5.

That the contract was made and the sale consummated is not questioned. The only issue is as to where the contract was made. We think it was made in Wisconsin and so hold.

In view of our holding on this point, and the obvious absence of any contact that Manitowoc had with this state, it is unnecessary to consider, even if the contract had been made in Maryland, whether there were sufficient minimal contacts to meet constitutional requirements for liability *in personam.*

> *Judgments affirmed; the appellants to pay the costs.*

BRUNE, C. J., filed the following concurring opinion.

The question presented on this appeal is whether or not Manitowoc, a manufacturer, is amenable to suit in Maryland

on a contract for the sale of a crane manufactured by Manitowoc in Wisconsin and sold to Linder, a purchaser in Maryland. (I abbreviate the names of the parties as they are abbreviated in both the majority opinion and dissenting opinion.)

Manitowoc's amenability to suit here is sought to be sustained under Code (1957), Art. 23, § 92(a) or § 92(d), or both. The former in broad terms authorizes a suit in this State by a resident or by a person having a usual place of business in this State against a foreign corporation doing business here. I agree, as do the dissenting Judges, with the majority opinion insofar as it holds that Manitowoc was not doing business in Maryland and hence is not amenable to suit here under § 92(a).

§ 92(d) also authorizes suits in this State by a resident or other person having a usual place of business in this State against a foreign corporation "on any cause of action arising out of a contract made within this State * * * whether or not such foreign corporation is doing or has done business within this State." In order to meet constitutional requirements of due process under § 92(d) there must be, in addition to the making of the contract here, at least such minimum contacts of the foreign corporation with this State as not to offend traditional notions of fair play and substantial justice in order to subject it to liability *in personam* here. *International Shoe Co. v. Washington*, 326 U. S. 310; *Compania De Astral v. Boston Metals Co.*, 205 Md. 237, 107 A. 2d 357, 108 A. 2d 372.

As to whether the contract was made in Maryland or in Wisconsin, I agree with the views expressed by Judge Hammond in his dissenting opinion, which is concurred in by Judge Marbury, that the contract was made in Maryland. I think, as they do, that Manitowoc itself took over the negotiations with Linder, and that, without regard to any limitations which it might otherwise have been entitled to insist upon under its agreement with Chesapeake, it made a counterproposal to Linder in Baltimore (submitted through Chesapeake as its agent for this purpose), which Linder accepted in Baltimore.

I find myself unable to agree, however, with the view stated in the dissenting opinion that Manitowoc's contacts with Mary-

land were sufficient to meet the minimum requirements of the constitutional test above stated. Therefore, I concur in the result reached by the majority.

HAMMOND, J., filed the following dissenting opinion, in which MARBURY, J., concurred.

In my view the Court is clearly correct in holding, under our prior decisions, that Manitowoc was not doing business in Maryland, but it is equally clear to me that the contract which led to the effort by Chesapeake and Linder to make Manitowoc subject to the jurisdiction of a Maryland court was made in Maryland, and that Manitowoc's contacts within the State with Maryland individuals and corporations were such as to make maintenance of suit against it here compatible with traditional notions of fair play and substantial justice, to use the measure established by *International Shoe Company v. Washington,* 326 U. S. 310.

Code (1957), Art. 23, Sec. 92 (d) (enacted in 1937 as Ch. 504, Sec. 118 (d) of the Laws of 1937), provides that every foreign corporation shall be subject to suit in this State by a resident of this State "on any cause of action arising out of a contract made within this State * * * whether or not such foreign corporation is doing or has done business in this State." In *Compania De Astral v. Boston Metals Company,* 205 Md. 237, we held (a) that the statute was constitutional, (b) that the contract there involved was made in Maryland, and (c) that although the foreign corporation was not doing business in Maryland it had had sufficient contacts with this State to justify the exercise of judicial jurisdiction over it. The Court said in *Astral* at page 252 of 205 Md.:

"* * * the final act necessary to the completion of the contract—that is, to make it a binding obligation — was done in Maryland, and Maryland is consequently the place where the contract was made. *Sun Insurance Co. v. Mallick,* 160 Md. 71, 153 A. 35; *Union Trust Co. v. Knabe,* 122 Md. 584, 89 A. 1106; 1 *Williston on Contracts* (Rev. Ed.), Section 97."

The distributorship agreement between Manitowoc and Chesapeake in force in 1957, when the contract here involved

was made, provided that Chesapeake "shall have no authority to bind nor obligate" Manitowoc "in any manner whatsoever." The purpose of this limitation is then made plain by the immediately ensuing language:

> "All orders taken or received by said Party of the Second Part shall immediately be forwarded to said Party of the First Part for acceptance or rejection, together with a report on the financial condition of the party who gave said order. Party of the First Part expressly reserves the right to and shall either accept or reject such order and advise the said Party of the Second Part thereof." [1]

The sequence of events and the series of writings between Chesapeake and Manitowoc show that the latter waived or chose not to exercise its right, on which it relies heavily, if not completely, to have the contract a Wisconsin contract, and made an offer in Maryland to Linder which Linder accepted in Maryland. Manitowoc deliberately set the stage for Linder to perform in Maryland the final act which effected a binding obligation between it and Manitowoc.

Early in January 1957 Chesapeake aroused Linder's interest in a Manitowoc crane. Linder's president testified he liked Manitowoc products and "was sold almost before they showed me the literature, * * * and we made a trip to Boston prior to January 28, 1957, where they showed me Manitowoc truck cranes that were being used by others."

On January 21, 1957, Chesapeake offered Linder its proposal No. 270 for a 40 ton Manitowoc Mobile Crane with its usual equipment and some modifications from the usual, desired by Linder. On January 28, Chesapeake sent Manitowoc its written purchase order No. 7550 for 1 Model 2800—40 ton Manitowoc Crane, specifying the various parts and equipment and

---

1. A subsequent agreement, made in 1960 between Manitowoc and Chesapeake, provided: "All orders shall be subject to acceptance by Manitowoc by the signature of an executive officer of Manitowoc at its home office at Manitowoc, Wisconsin, before such contract shall be binding on Manitowoc."

the motive power. Telephone talks between Chesapeake and Manitowoc followed, and details and changes in specifications were arranged in these talks and by telegrams. On February 18, Chesapeake again wrote Manitowoc as follows:

"Attached herewith is copy of letter to Mr. R. E. Linder of the R. E. Linder Steel Erection Company regarding shipment of *his* machine covered by our Purchase Order No. 7550.

"It is imperative that you expedite this order so as to meet the promised shipping dates." (Emphasis supplied)

The letter of February 18 to Mr. Linder, referred to, included the following:

"As per your request of today, we have this date instructed the Manitowoc Engineering Corporation to ship via rail the Model 2800 Truck Crane with the standard 40 ft. of boom and 30 ft. of jib instead of the 120 ft. of boom as originally ordered. The additional 80 ft. of boom is to be shipped as soon as possible.

"From our phone conversation with the factory today, it is our understanding that the machine along with the 40 ft. of boom and 30 ft. of jib will be ready for shipment approximately March 1st. The additional 80 ft. of boom will be ready for shipment sometime the week of March 11th."

The sales manager of Chesapeake testified that Manitowoc had informed Chesapeake that Manitowoc would sell the desired crane to Linder if 10% of the purchase price accompanied the order and the balance were paid by acceptance of sight draft upon delivery of the machine. On February 25, 1957, Chesapeake wrote Manitowoc as follows:

"As per our recent telephone conversation attached herewith is check in the amount of $6,446.50 covering the downpayment on our *Purchase Order No. 7550* and additions to this order as contained in our two telegrams of February 18th.

"Please arrange to have this machine shipped via fastest practical rail freight to the R. E. Linder Steel Erection Company, 231 E. North Avenue, Baltimore, Maryland.

"As to the balance, Sight Draft will be satisfactory with Mr. Linder. His bank is the National Central Bank, Baltimore & Holliday Streets, Baltimore, Maryland, Attention: Mr. Ghingher.

"Both Mr. R. E. Linder and the writer will arrive in Manitowoc on March 5th to discuss *his machine* and if there are any questions, they can be straightened out at that time."

The testimony was that all letters to Manitowoc and the copy of the letter from Chesapeake to Linder were received in the ordinary course of business by Manitowoc.

On March 5, Mr. Linder and the sales manager went to Manitowoc, Wisconsin. The machine was then substantially complete, needing only a final coat of paint and a few feet of boom. The machine was put through tests and Mr. Linder's operating engineer familiarized himself with its workings. Mr. Linder's recollection of the trip to Manitowoc was that he was pressing for early delivery and he took his engineer out to Wisconsin "so he could become familiar with the machine and the factory people."

After he had been served lunch, Mr. Linder had a talk with the treasurer of Manitowoc and reiterated that the National Central Bank of Baltimore would pay a sight draft for the balance of the purchase price.

Mr. Linder testified, in summarizing the sequence of events (and there was no contravention of his testimony), that prior to February 25, 1957, he had "considerable negotiations" concerning details of the transaction with the sales manager of Chesapeake. He then said: "After we finally ironed out all the details, and we had this crane just the way I wanted, they finally arrived at a final quotation, which is dated February 25, 1957, and I accepted that the same day, and I gave them the balance of the down payment which he requested."

The proposal which Linder accepted in writing in Maryland

was for a Model 2800 Truck Crane with full specifications as to equipment and motive power at a price of $66,265.00, less 2% cash discount, or a net amount of $64,465.00, with a 10% down payment and payment of the balance by sight draft. The check which Chesapeake mailed in Maryland to Manitowoc on the same day, February 25, 1957, in its letter from which we have quoted, with money given it in Maryland by Linder, was for $6,446.50, the 10% down payment. When the machine was delivered, the bank paid the sight draft.

It is apparent to me that in this transaction Manitowoc decided to make and did make Chesapeake its agent to submit to Linder a proposal to sell it a mobile crane at a specified price, provided 10% of the purchase price was paid upon acceptance of the proposal and the balance by sight draft on shipment of the machine. It seems equally clear that Linder accepted Manitowoc's proposal in Maryland by signing the proposal submitted by Chesapeake as Manitowoc's agent under express prior authorization and by giving to Chesapeake the money requested as the down payment to be transmitted to Manitowoc. Manitowoc never gave written or formal acceptance of any kind to the order, except that on the face of its own invoice, dated March 8, 1957, Manitowoc declares that the crane was "sold to R. E. Linder Steel Erection Co." and that the crane was "shipped to R. E. Linder Steel Erec. Co."

When Linder accepted Manitowoc's proposal and gave the money to Chesapeake to be sent to Manitowoc, and agreed to comply with the proposal as to the sight draft on delivery, a binding contract arose. Manitowoc had told Chesapeake to inform Linder in Maryland of its willingness to sell Linder a specified machine at a specified price on specified terms. After Linder's acceptance can it be doubted that if Manitowoc had thereafter refused to deliver the crane that Linder could have successfully sued it for breach of contract?

It is of no moment that Manitowoc could have qualified its proposal by saying that the negotiations would not become a contract until it so agreed in Wisconsin, in writing, or otherwise, because it did not do so. What happened was in substance and effect, as I see it, the same as if Manitowoc had sent its vice president to Maryland to make to Linder the ex-

act proposal which Chesapeake made and Linder accepted. The final act necessary to make a binding obligation having been performed in Maryland, the contract was a Maryland contract. *Compania De Astral v. Boston Metals Company, supra.*

Assuming that more is necessary than the making of the contract in Maryland, there can be little real doubt, I think, that Manitowoc had sufficient contacts with Maryland citizens and corporations in connection with the transaction involved to make it appropriate and constitutional for the statutes making a foreign corporation liable to suit here to operate.

In addition to having a soliciting agent in Maryland, Manitowoc had a regional sales representative who came to Maryland from time to time to assist in making sales. When the crane here involved arrived in Baltimore, Manitowoc sent its factory representative to supervise the unloading and assembly of the crane which took several days, and to further train the employee of Linder who was to operate the crane, which took another day or two. When the crane collapsed, Manitowoc sent its factory representative, together with a representative of the company which made the undercarriage on which the crane was mounted, to assist in righting the wrong. The Manitowoc factory representative supervised and worked on the repairs, spending some fifty-nine hours in Baltimore.

The purpose of the statute giving jurisdiction to Maryland over foreign corporations making a Maryland contract would seem to be thwarted unless the courts exercise jurisdiction over such a corporation when it chooses to make such a contract in Maryland, and when the nature and the details of the controversy make it fair, equitable and appropriate that differences involved be settled by a local court. All of the facts which would cause a court to exercise a constitutional power to judge the foreign corporation and its adversaries seem to be present here. I would reverse on the ground that the contract between Linder and Manitowoc was a Maryland contract which led up to events properly and desirably adjudicative here.

Judge Marbury has authorized me to say that he concurs in the views herein expressed.